**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Sandra Pasanen, | : | Case No. 1:09CV2224 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423 and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U. S. C. §§ 1381 *et seq*. Pending are the parties' briefs on the merits (Docket Nos. 14 & 19). For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

I. **PROCEDURAL BACKGROUND**

On July 7, 2006, Plaintiff filed applications for a period of disability, DIB and SSI alleging disability beginning June 17, 2006 (Docket No 10, Exhibit 2, p. 10 of 43). Plaintiff's requests for SSI and DIB benefits were denied initially and upon reconsideration (Docket No. 10, Exhibit 6, pp. 2, 5, 8 and 11 of 37). On October 21, 2008, Administrative Law Judge (ALJ) William T. Vest, Jr held an administrative hearing by video teleconference at which Plaintiff was granted leave to obtain legal

counsel (Docket No. 10, Exhibit 2, p. 21 of 43). On February 11, 2009, Plaintiff, represented by counsel, and Vocational Expert (VE) Barbara Ayres testified at a hearing before the ALJ (Docket 10, Exhibit 2, pp. 19 of 43, 21 of 43). The ALJ rendered an unfavorable decision on March 12, 2009 (Docket No. 10, Exhibit 2, pp. 10-18 of 43). The Appeals Council denied Plaintiff's request for review on August 3, 2009 (Docket No. 10, Exhibit 2, pp. 2 - 4 of 43). Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

## II. JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## III. FACTUAL BACKGROUND

A. PLAINTIFF'S TESTIMONY.

On the onset date of her disability, Plaintiff was 46 years of age. She was five feet five inches tall and weighed 141 pounds. Plaintiff completed the tenth grade. She could read an article in the newspaper but not comprehend its meaning. She had no difficulty adding and subtracting. Plaintiff was the mother of one son. She resided alone in a house that she rented. She had no income. Her son, estranged husband and Community Action all assisted her with payment of her rent and utility bills (Docket No. 10, Exhibit 2, pp. 24, 27 of 43, 30 of 43).

Plaintiff was injured on the job in 2006. Her back simply "snapped" and she fell to her knees (Docket No. 10, Exhibit 2, pp. 27 of 43). She was unable to return to work as her back hurt every time she would bend, her fingers cramped and she had chronic pain in her back and legs. Her physician gave her free samples of Ibuprofen to relieve the pain (Docket No. 10, Exhibit 2, p. 28 of 43).

Plaintiff complained that she suffered from back pain in the lower part of her back and spine.

The nature of the pain was shooting, stabbing and aching pain that radiated into her legs. Since she did not have medical health care coverage, she was taking over the counter medication to relieve the pain (Docket No. 10, Exhibit 2, p. 31 of 43). She used alternative measures to relieve the pain such as soaking in the bathtub or using a heating pad (Docket No. 10, Exhibit 2, p. 32 of 43).

Plaintiff also suffered from clogged arteries that resulted in poor circulation (Docket No. 10, Exhibit 2, p. 32 of 43). Her right leg has actually been so numb that she could not feel it when she stood up (Docket No. 10, Exhibit 2, p.

Plaitniff had a history of migraine headaches. She had headaches two to three times per week for several hours. Occasionally, Plaintiff obtained an injection for relief (Docket No. 10, Exhibit 2, p. 34 of 43).

Plaintiff estimated that she could lift five pounds and walk for five minutes Her daily activities included cleaning house. Her attempts at cleaning house were interrupted by frequent breaks. She estimated that she rarely accomplished much cleaning (Docket No. 10, p. 29 of 43).

**B.    VE TESTIMONY.**

The ALJ described Plaintiff's past relevant work of an assembler as light physical demand and unskilled work. An individual who could lift and carry ten pounds occasionally, sit for six hours of an eight hour workday, walk or stand for two hours in an eight hour workday with a sit/stand option, with no climbing, no pushing or pulling with the upper extremities and limited to no stress, simple tasks, could perform work as a food and beverage order clerk. There were 40,000 jobs nationally and 1,000 in Ohio. There were 50,000 jobs nationally and 1,000 jobs in Ohio if the hypothetical were modified to limit the hypothetical plaintiff to performing in a seated position with no moving over ten pounds. If the hypothetical person could use both hands but would lack fine hand motion skills, the assembly

work would be eliminated (Docket No. 10, p. 36 - 37 of 43).

Limiting the residual functional capacity (RFC) to light work, the ALJ requested that the VE consider a person who could lift and carry ten pounds frequently and twenty pounds occasionally, sit for eight hours in an eight-hour workday, walk or stand six hours in an eight-hour workday with alternate sitting and standing, no pushing or pulling with the upper extremities and low stress and simple repetitive tasks. Jobs that would accommodate this profile included agricultural produce order clerk, marker clerk and parking lot cashier. There were 250,000 produce order clerks nationally and 600 produce order clerks in Ohio. There were 210,000 market clerk positions nationally and 1000 market clerk positions in Ohio. There were 140,000 parking lot cashier jobs nationally and 2,000 parking lot cashier jobs in Ohio.

### Iv. SUMMARY OF MEDICAL EVIDENCE

The x-rays of Plaintiff's lumbar spine with views of the sacrum and coccyx administered on January 31, 1998, demonstrated the bony structures to be intact. The sacroiliac joints had a normal appearance (Docket No. 10, Exhibit 12, p. 4 of 36).

On January 30, 1998, Plaintiff reported to her physician that she had a number of episodes during which her legs collapsed under her after getting out of bed. The attending physician opined that the etiology of Plaintiff's "spells" could be secondary to some lumbar degenerative disc disease (Docket No. 10, Exhibit 11, p. 20 of 34). She also reported leg numbness and weakness (Docket No. 10, Exhibit 11, p. 21 of 34).

In March 1998, it was suspected that Plaintiff had gastroesophageal reflux disease with esophageal spasm. The esophageal spasm was suspected of causing pain. The attending physician treated the symptoms with a trial of Pepcid® (Docket No. 10, Exhibit 11, p. 18 of 34).

In February 1999, an ultrasound of Plaintiff's pelvis showed a mild enlargement of her left ovary (Docket No. 10, Exhibit 12, p. 2 of 36).

Plaintiff's cholesterol levels were markedly elevated on April 8, 2008. She was advised to follow a low cholesterol diet for six months. She also complained of aching pain in her feet (Docket No. 10, Exhibit 11, p. 19 of 34).

Plaintiff complained of leg pain on May 14, 1998. Studies of her circulation showed evidence of irritable obstruction of the intestines inflow disease. Plaintiff was advised to stop smoking and to start exercising (Docket No. 10, Exhibit 11, p. 17). On May 27, 1998, Plaintiff complained of feeling nauseated, shaky, numb and having some low back pain. She was diagnosed with "influenza as a syndrome of nausea with myalgia that has been endemic" (Docket No. 10, Exhibit 11, p. 16 of 34).

In June, 1998, Plaintiff reported tightness of chest and back and dyspnea. She was examined for signs of obvious distress. The attending physician found minimal tenderness in the lower quadrants (Docket No. 10, Exhibit 11, p. 15 of 34). Plaintiff complained of left shoulder pain, coughing and a left little toe infection on October 28, 1998 (Docket No. 10, Exhibit 11, p. 14 of 34). On December 19, 1998, Plaintiff complained of throbbing pan in her left leg and left foot radiating to her hip (Docket No. 10, Exhibit 11, p. 13 of 34).

On June 3, 1999, it was noted that Plaintiff complained of right kidney pain (Docket No. 10, Exhibit 11, p. 9 of 34).

On January 10, 2001, Plaintiff was treated for headaches, vision problems and numbness. The results from the computed tomography (CT) scan were negative (Docket No. 10, Exhibit 11, p. 6 of 34). Plaintiff was treated for recurrent headaches on February 14, 2001, with an increased dosage of Atenolol and a trial of Midrin (Docket No. 10, Exhibit 11, p. 5 of 34).

5

On February 17, 2002, Plaintiff sustained forehead trauma when she drove into a telephone pole. On February 27, 2002, Plaintiff was treated for pain in the left scapular region and right upper quadrant and abdominal pain of unknown etiology (Docket No. 10, Exhibit 11, pp. 3-4 of 34).

On June 24, 2004, Dr. Alexander Jakubowycz, M. D., diagnosed Plaintiff with abdominal and pelvic pain of unclear etiology (Docket No. 10, Exhibit 12, p. 12 of 36).

On August 3, 2004, following a colonoscopy a rectal mass, a large polyp and small external hemorrhoids were detected (Docket No. 10, Exhibit 12, p. 19 of 36).  The polyp was removed by snare cautery.

A CT scan of the pelvis on August 21, 2004, revealed a small low attenuation lesion in the left ovary (Docket No. 11, Exhibit 12, p. 10 of 36).

On March 6, 2005, Dr. Michael R. Baumgardner, M. D., diagnosed Plaintiff with an acute febrile illness with nausea and vomiting and a viral syndrome (Docket No. 10, Exhibit 12, p. 14 of 36).  The results from an abdominal study completed on June 2, 2005 showed no evidence of acute cardiopulmonary abnormality (Docket No. 10, Exhibit 12, p. 35 of 36).

On June 2, 2006, chemical tests revealed that Plaintiff's levels of sodium and potassium were low (Docket No. 10, Exhibit 12, p. 27 of 36).

On September 5, 2006, Dr. Mary Helene Massullo conducted a physical examination and reported that Plaintiff's mental status appeared normal; there was diminished capillary refill of the hands and feet with dusky appearance.  She also noted a slightly deviated nasal septum to the right, poor dental repair and slightly diminished vibratory sensation bilateral upper and lower extremities (Docket No. 10, Exhibit 13, p. 6 of 40).  She determined that Plaintiff's range of motion in the cervical spine, shoulders, elbows, hands-fingers, dorsolumbar spine, hips, knees and ankles was within the normal range (Docket No. 10, Exhibit 13, pp. 7-8 of 40).

Also on September 5, 2006, Dr. Albert M. Bleggi identified a very minimal amount of L5-S1 facet hypertrophy with minimal disc space narrowing at L5-S1. There was evidence of mild curvature of the spine but no acute or destructive bone process (Docket No. 10, Exhibit 13, p. 11 of 40).

Dr. J. Joseph Konieczny, Ph. D., a psychologist, conducted a clinical interview on September 25, 2006, during which he administered the Wechsler Adult Intelligence Scale (WAIS), a clinical instrument designed to measure intelligence, Wechsler Memory Scale (WMS), an measure of memory, and the Wide Range Achievement Test (WRAT), an achievement test measuring reading, spelling and math. Plaintiff's full scale intelligent quotient (IQ) placed her in the deficient range of adult intellectual functioning (WAIS). The results of Plaintiff's memory capabilities showed a moderate degree of scatter and range from the deficient level up to the low-average level (WMS). Plaintiff's achievement capabilities in spelling and math computation were in the borderline range (WRAT) (Docket No. 10, Exhibit 13, pp. 16-17 of 40). Dr. Konieczny's opinion, stated with reasonable scientific certainty, was that Plaintiff suffered from depressive disorder and borderline intellectual functioning (Docket No. 10, Exhibit 13, p. 17 of 40).

Dr. Marianne Collins, Ph. D., opined on October 9, 2006, that Plaintiff had a markedly limited ability to understand, remember and carry out detailed instructions (Docket No. 10, Exhibit 13, p. 19 of 40). She, too, opined that a depressive disorder, not otherwise specified and borderline intellectual functioning (Docket No. 10, Exhibit 13, p. 26 and 27 of 40). In rating functional limitations, Dr. Collins suggested that Plaintiff had mild restriction of activities in daily living and moderate difficulties in her abilities to react appropriately with the general public, get along with co-workers and to respond appropriately to changes in the work setting (Docket No. 10, Exhibit 13, p. 33 of 40).

On April 2, 2007, the levels of Plaintiff's low density lipoprotein, also known as the "bad" cholesterol, exceeded the normal range (Docket No. 10, Exhibit 14, p. 23 of 23).

On June 12, 2007, Dr. James Chillcott gave Plaintiff samples of Crestor to treat her high cholesterol and high triglycerides (Docket No. 10, Exhibit 14, p. 9 of 23).

Acknowledging her history of gastroesophageal reflux and hyperlipidemia diseases, Dr. Chillott prescribed medication designed to treat an erosive esophagus October 11, 2007. Dr. Chillott also noted the presence of a corneal ulcer in the right eye (Docket No. 10, Exhibit 14, pp. 7 of 23).

On February 3, 2009, Dr. Chillcott determined Plaintiff's ability to do work related activities on a day-to-day basis as follows:

>   Plaintiff can/must:
>   - lift/carry less than ten pounds occasionally and frequently.
>   - stand/walk less than two hours,
>   - sit during an eight-hour day about two hours,
>   - alternate sitting, standing or walking to relieve discomfort after five minutes,
>   - stand for five minutes before changing position,
>   - shift positions at will,
>   - lie down at times at unpredictable intervals during the work shift,
>   - reach and finger occasionally,
>   - handle less than occasionally,
>   - feel frequently, and
>   - never push/pull.

Dr. Chillcott opined that on an average, Plaintiff would be absent from work more than three times monthly (Docket No. 10, Exhibit 13, pp. 39 and 40 of 40).

Dr. Jean Blair, M. D., collected and evaluated cells from Plaintiff's cervix and the mucous membrane lining the cervix. The results were negative for lesion or malignancy within the layer of cells that form the lining of the cervix (Docket No. 10, Exhibit 14, p. 19 of 23).

On February 10, 2009, Dr. Chillcott observed a right ovarian cystic mass as a result of a pelvic ultrasound (Docket No. 10, Exhibit 14, p. 14 of 23

### v. STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart,* 475 F.3d

727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively. To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not

9

disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### VI. ALJ DETERMINATIONS

After consideration of the entire record, the ALJ made the following findings of facts:

1. Plaintiff met the insured status requirement of the Act through December 31, 2007.

2. Plaintiff had not engaged in substantial gainful activity since June 17, 2006.

3. Plaintiff had severe impairments, namely, borderline intellectual functioning, depression and lumbar degenerative disc disease. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listing impairments in 20 C. F. R Part 404, Subpart P, Appendix 1.

3. Plaintiff had the RFC to lift and carry ten pounds frequently and twenty pounds occasionally, sit eight hours in an eight-hour workday and stand and walk six hours. Plaintiff retains the capacity to perform light work so long as it does not involve any pushing or pulling with the lower extremities and no climbing. Plaintiff was suited for low stress, simple, repetitive jobs.

4. Plaintiff had no past relevant work.

5. Plaintiff, a younger individual aged 18 to 49 years, had a tenth grade education. Considering her age, work experience and RFC, there were a significant number of jobs that she could perform.

6. Plaintiff was not under a disability as defined in the Act from June 17, 2006, to the date of the decision on March 12, 2009.

(Docket No. 10, Exhibit 2, pp. 10 to 17 of 43).

### VII. STANDARD OF REVIEW

The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.

*McClanahan, supra*, 474 F.3d 830 at 833 (*citing Branham v. Gardner,* 383 F.2d 614, 626-627 (6th Cir. 1967)). In fact the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. *Id.* (*citing* 42 U.S.C. § 405(g )). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services,* 966 F.2d 1028, 1030 (6th Cir. 1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore the reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

### VIII. PLAINTIFF'S POSITIONS.

1. Plaintiff argues that the ALJ erred by failing to find that Plaintiff's impairments met 12.05 of the Listing.

2. Plaintiff argues that the ALJ erred by rejecting the opinions of the treating physician, Dr. Chillcott.

3. Plaintiff argues that the ALJ's decision does not comply with SSR 96-5p and SSR 96-2p.

### IX. DEFENDANT'S POSITIONS

**1.** Defendant contends that substantial evidence supports a finding that Plaintiff's mental impairment did not meet 12.05 of the Listing.

2. Defendant argues that the ALJ improperly rejected Dr. Chillcott's opinion.

11

**X. ANALYSIS**

**1.   SECTION 12.05 OF THE LISTING.**

Plaintiff contends that the ALJ erred, at step three of the sequential evaluation, in determining that she did not meet the criteria in Listing 12.05(C).

The structure of the listing for mental retardation is set forth in Listing 12.05. 20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2010). Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. 20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2010). It also contains four sets of criteria (paragraphs A through D). If the claimant's impairment satisfies the diagnostic description in the introductory paragraph and any one of the four levels of severity criteria in A, B, C, or D, a finding that the impairment meets the listing will follow. 20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2010). The listing's introductory instructions are no less mandatory than the listing itself. 20 C. F. R. § 404.1525(c)(2) (Thomson Reuters 2010). Consequently, every mental disorder listing includes a diagnostic description of the disorder and specific criteria measuring the disorder's severity.

The introductory paragraph of Listing 12.05 sets forth a diagnostic description for mental retardation. Mental retardation is defined as a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. 20 C. F. R. Pt. 404, Subpt. P, App. 1 (Thomson Reuters 2010). Listing 12.05(C) presumes a claimant to be disabled if he or she meets a two-pronged test: (1) "[a] valid verbal performance, or full scale IQ of 60 through 70" and (2) "a physical or other mental impairment imposing additional and significant work-related limitation of function." 20 C. F. R ., pt. 404, subpt. P., App. 1, 12.05(C) (Thomson Reuters 2010). Where verbal, performance and full-scale IQ scores are provided, as on the WAIS test, the Commissioner must

12

consider the lowest of these scores in conjunction with Listing 12.05(C). 20 C.F.R., pt. 404, subpt. p., app. 1, 12.00 D (Thomson Reuters 2010).

In the instant case, the intelligence quotient tests administered in 1968, revealed a full scale intelligence quotient of 73, a nonverbal score of 80 and a verbal intelligence score of 71. These test scores were indicative of borderline intellectual functioning, not mental retardation. Plaintiff reported that she was "involved in" special education during her elementary and junior high school years. Her full scale IQ of 67 derived from tests administered on September 25, 2006, placed her within the deficient range of adult intellectual functioning, not the range of mental retardation. Dr. Konieczny determined that Plaintiff did not suffer from mental retardation, but instead suffered from borderline intellectual functioning (Tr. 22, 25). Neither Plaintiff's care providers nor other medical professionals who examined the record in this case concluded that Plaintiff was mentally retarded or satisfied the "diagnostic description" of mental retardation articulated in the introductory paragraph of Section 12.05. The record contains no direct evidence that Plaintiff experienced deficiencies in adaptive behavior or suffered from mental retardation prior to the age of 22. The diagnosis of borderline intellectual functioning is clearly inconsistent with a diagnosis of mental retardation. As noted by the ALJ, a finding of mental retardation is required to satisfy listing 12.05C (Docket 10, Exhibit 2, p. 13 of 43, fn. 1). The ALJ's findings are conclusive as there is substantial evidence that the introductory requirements of Section 12.05 have not been met.

**2.    THE TREATING PHYSICIAN RULE**

Plaintiff argues that the ALJ failed to articulate legitimate reasons for rejecting her treating physician's opinions.

The treating physician's opinion is normally entitled to substantial deference, but the ALJ is not

bound by that opinion. *Jones v. Commissioner of Social Security,* 336 F. 3d 469, 477 (6th Cir. 2003) (*citing Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987)). The treating physician's opinion must be supported by sufficient medical data. *Id.* (*see Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985)). If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection. *Id.* (*see Shelman,* 821 F.2d at 321).

The ALJ reviewed Dr. Chillcott's opinions and gave substantial deference to his treatment of hyperlipidemia, gastrointestinal reflux, headaches and abdominal pain (Docket No. 10, Exhibit 2, pp. 13, 15 of 43). However, the ALJ found that Dr. Chillcott was sympathetic to Plaintiff's quest for Medicaid eligibility. The questionnaire regarding Plaintiff's ability to perform the functions of work included extensive limitations that would equate to a finding of disability. The ALJ discounted these findings and did not give controlling weight to Dr. Chillcott's conclusions that Plaintiff was disabled as such conclusions were neither consistent with the medical evidence nor supported by objective medical evidence.

The ALJ complied with the correct legal standards in assessing a treating source. Consequently, the Magistrate recommends that his findings be affirmed.

**3.     POLICY INTERPRETATION RULINGS OF SSR 96-5P**

Plaintiff alleges that the ALJ's analysis fails to comply with Policy Interpretation Rulings SSR 96-5p.

POLICY INTERPRETATION RULING TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER, SSR 96-2P, decided on July 2, 1996, carries the weight, if any, to be attributed to treating sources on issues reserved for the Commissioner. While the adjudicator must

evaluate all of the evidence in the case record to determine the extent to which the opinion is supported by the record, treating source opinions are never entitled to controlling weight on opinions that are reserved for the Commissioner. *Id.* at *2.

The ALJ specifically claims that he followed the dictates of SSR 96-5p (Docket No. 10, Exhibit 2, p. 15 of 43). His findings reflect that he considered all of the evidence in the record to determine which opinions were supported by substantial evidence. He did not attribute controlling weight to the opinions of Dr. Chillcott in ascertaining disability. The Magistrate cannot find that the ALJ failed to follow the correct legal standards in resolving any conflict arising from the weight to give medical opinions and the issues reserved for the Commissioner.

**4.    POLICY INTERPRETATIONS OF SSR 96-2P.**

Plaintiff claims that the ALJ failed to articulate specific and legitimate reasons that make it clear to subsequent reviewers, the weight attributed to treating source medical opinions.

SSR 96-2p, POLICY INTERPRETATION RULING TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, decided also on July 2, 1996, provides an explanation of terms, specifically the terms treatment sources. Under this ruling, a treating source opinion is entitled to controlling weight if the opinion is: (1) from a treating source, (2) a medical opinion and (3) well supported by medically acceptable clinical and laboratory diagnostic techniques. *Id.* at 2. A treating source includes a physician or other acceptable medical source who provided medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant that includes the frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the claimant's medical condition(s). 20 C. F. R. §§ 416.902, 404.1502 (Thomson Reuters 2010).

15

Dr. Chillcott is unequivocally the only physician with whom Plaintiff had an ongoing treatment relationship. The ALJ gave deference to those opinions that Dr. Chillcott supported with objective medical evidence and he discounted those findings and/or conclusions that were not supported by objective medical evidence. The Magistrate has already determined that the ALJ complied with the correct legal standards in assessing a treating source. By doing so, the ALJ also complied with the regulations in SSR 96-2p.

## XI. CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Dated:  January 14, 2011

## XII. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.